DECISION AND JUDGMENT ENTRY
This is an appeal from a judgment of the Lucas County Court of Common Pleas, following a jury trial, wherein defendant-appellant, Harold Laney, was found guilty of voluntary manslaughter, in violation of R.C.2903.03.
On September 1, 1999, appellant was indicted on one count of murder, in violation of R.C. 2903.02(A), with a repeat violent offender specification under R.C. 2941.149. The indictment stems from the August 28, 1999 stabbing death of William Andy Lofton which occurred in Toledo, Lucas County, Ohio. The case proceeded to trial on February 8, 2000.
The undisputed evidence is as follows. On the evening of August 27, 1999, appellant, his girlfriend Jadie Laughlin, Jadie's children, Chris Kozbial, Karen Poturalski, and Karen's niece and nephew, were all at a residence located at 1202 South Avenue, Toledo, Ohio, which, on that date, was the home of Karen's sister, Patty Sprague. The adults were playing a drinking game. At approximately 1:00 a.m., the women decided to go to Bogart's, a local bar. Shortly thereafter, Kozbial went to Bogart's in order to get his girlfriend who was supposed to be babysitting her sister's children. Instead of returning, Kozbial stayed at the bar with the women. At the bar he observed appellant's girlfriend, Laughlin, dancing with a man he later identified as Lofton, the victim.
After the bar closed, Laughlin had the victim walk her home. Appellant was outside the residence and told Lofton to leave. Appellant met up with Lofton at the corner and a scuffle ensued. Lofton ran away. In the early morning of August 28, 1999, Lofton died as a result of multiple stab wounds.
At trial, the testimony focused on whether appellant was the person who stabbed Lofton. Mark Shaver, a neighbor at 1206 South Street, testified that in the early morning of August 28, appellant was very agitated because his girlfriend left and went to a bar. Shaver testified that appellant called Bogart's and spoke with Kozbial and that Shaver spoke with Laughlin, each telling them to come home.
Shaver testified that at approximately 3:25 a.m., he and his brother-in-law were sitting outside and saw Laughlin and Lofton approaching. Laughlin went into the house and Lofton continued up the street. Shaver testified that appellant "stormed" out of the house to see whom his girlfriend had been with. Shaver stated that appellant told Lofton to: "Get the f * * * out of here." Appellant then began approaching Lofton who, as appellant advanced, began backing up. Shaver testified that he did not see anything in appellant's hands. Appellant backed Lofton up next to a car and, according to Shaver, it looked like they were knife fighting. Lofton then ran north, up Daniels Street. Shaver testified that appellant came up to him and said: "I got him, I got him good."
Shaver's brother-in-law, Joseph Ray, next testified that appellant was upset that the women and Kozbial went to the bar and that no one was watching the children. Ray testified that he walked to Bogart's, a six or seven minute trip, and informed Kozbial, Laughlin and Poturalski that appellant wanted them to come home. The group refused to leave so Ray returned home.
Ray testified that when Laughlin and Lofton first approached he was in the house getting cigarettes. When he returned outside Ray testified that appellant was walking towards Lofton and telling him to "get out of here." When asked whether Lofton had a jacket on, Ray indicated that he was not sure what he had on but described it as a "flannel." Ray testified that right before the physical altercation started, he saw "flashes of light coming off of metal." He stated that he never actually saw either of them with a knife. Ray testified that after the fight appellant stated: "I got him and I got him good."
Christopher Kozbial testified that on the evening of August 27, 1999, he and his girlfriend, Karen Poturalski, were at her sister's house drinking beer. Appellant's girlfriend arrived with her children and, a little later, appellant arrived.
Later in the evening, Kozbial, Poturalski and Laughlin were at Bogart's Bar. Kozbial testified that he saw Laughlin dancing with a "young black male." After the bar closed, according to Kozbial, Laughlin was being harassed by a group of "Spanish Americans" in a car and asked Lofton to walk her home. He did not see Laughlin again that night.
Kozbial testified that on the morning of August 28, at approximately 9:30, Sprague's son, nicknamed "Bubba", came in through the back door with a knife and threw it in the sink. The state then admitted a knife into evidence. Kozbial identified the knife as the one he later washed, and that it was from the Sprague residence.
Patty Sprague, the tenant at 1202 South Avenue, testified that her son, five at the time of the incident, told her that on the morning of August 28, he found a knife outside and that it had ketchup on it. She stated that the knife was from her kitchen. She was certain of this because the knife was her favorite and she used it often.
Detective Terry Cousino, of the Toledo Police Department, next testified that on the morning of August 28, he was called to investigate a possible homicide. Cousino described the trail of blood which began at the intersection of Colton and Daniels Streets, one block north of South Avenue, and proceeded north one block, to Walbridge Street, where Lofton was found. He testified that the blood volume increased closer to the body. He further stated that Lofton's shirt was found approximately eleven feet north of where he was lying. In Lofton's right back pocket, Cousino testified, there was a couple of twenty dollar bills and a set of keys.
The Lucas County Coroner, Dr. James Patrick, was the state's next witness. Patrick testified that Lofton suffered six separate stab wounds. The wounds to the heart and right lung were the most serious. He testified that due to the nature of the wounds, it would not be uncommon for only a small amount of blood to be at the scene of the injury. Patrick stated that it takes time for the blood to accumulate in the internal cavities before it begins coming out from the wound.
Patrick also testified that the wounds could have been caused by the knife in question. However, he could not say for certain that the knife was in fact used.
Patrick was questioned regarding the fact that only one hole was found in the front of appellant's shirt, when he was stabbed twice in his chest. He theorized that it was likely that after the first wound, the knife was not removed past the shirt prior to the second stab wound. During cross-examination, he further reasoned that because each of the knife wounds were corresponding as far as rotation of the knife, it would be unlikely that they occurred at separate times or by different individuals.
The last state witness was Margaret Saupe, a forensic scientist employed by the Ohio Bureau of Criminal Identification and Investigation ("BCI"). She testified that she works in the serology department and examines various body fluids. Saupe stated that her tests revealed the presence of human blood on the knife. Saupe stated that she did not have enough of a sample in order to determine whose blood was on the knife. The state then rested.
Appellant then called one witness, Toledo Police Detective David Mullin. Defense counsel questioned Mullin about a fight that had occurred at Bogart's just prior to the stabbing. Mullin indicated that Kozbial had been involved in the fight and he had spoken with him regarding it. He testified that Kozbial had given him appellant's first name and, through work records, was able to find out his last name and where he lived. Mullin also testified that Sprague gave him the knife.
Appellant was found guilty of voluntary manslaughter and this appeal followed.[1] Appellant now raises the following assignments of error:
"FIRST ASSIGNMENT OF ERROR
 "DEFENDANT-APPELLANT'S CONVICTION IS SUPPORTED BY INSUFFICIENT EVIDENCE AND IS THEREFORE A DENIAL OF DUE PROCESS.
 "SECOND ASSIGNMENT OF ERROR
 "DEFENDANT-APPELLANT'S CONVICTION IS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.
 "THIRD ASSIGNMENT OF ERROR
 "INSOFAR AS ANY ERROR COMPLAINED OF WAS NOT ADEQUATELY PRESERVED BELOW, DEFENDANT-APPELLANT WAS DENIED THE EFFECTIVE ASSISTANCE OF COUNSEL."
In his first assignment of error, appellant argues that the evidence presented against him at trial was insufficient to support a conviction. Specifically, appellant contends that there is no evidence which demonstrates that he had a knife during the altercation with Lofton. Further, no evidence establishes that the blood on the knife was Lofton's.
The Supreme Court of Ohio has set forth this court's standard of review as to the sufficiency of evidence:
 "An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." (Citation omitted.) State v. Jenks (1991), 61 Ohio St.3d 259, paragraph two of the syllabus.
In order to be convicted of voluntary manslaughter, the state must prove beyond a reasonable doubt that appellant, while under the influence of a sudden fit of passion or rage brought on by serious provocation, knowingly caused the death of Lofton. R.C. 2903.03.
As addressed in the state's answer brief, the elements of voluntary manslaughter can be proven by circumstantial evidence. See State v.Nicely (1988), 39 Ohio St.3d 147. "When the state relies on circumstantial evidence to prove an essential element of the offense charged, there is no need for such evidence to be irreconcilable with any reasonable theory of innocence in order to support a conviction." Jenks,supra, at paragraph one of the syllabus.
In the instant case, the testimony established that appellant was very agitated that his girlfriend left him to go to a bar. When he saw her with another man he confronted him and a fight ensued. After the fight he stated: "I got him good." Further, Shaver testified that it looked like the two were knife fighting, and Ray testified that he saw flashes of metal.
Lofton was found only a few blocks away and, according to the coroner's testimony, the blood trail was consistent as starting at the location of the fight. Finally, we have the knife that came from Sprague's kitchen which the coroner testified could have been used in the stabbing. Tests further revealed that the knife had human blood on it.
Appellant's theory that someone else committed the murder is not believable. Appellant's reference to a jacket that Lofton may have worn (that was not recovered) does not somehow establish that someone else stabbed him to steal his jacket. Only one witness testified that he had something, in addition to a T-shirt on. That witness stated that: "He had something on. I don't know what it was."
Based on the foregoing, we find that the circumstantial evidence presented by the state was sufficient to support a conviction in this case. We further find that a rational trier of fact could have found the essential elements of voluntary manslaughter proven beyond a reasonable doubt. Accordingly, appellant's first assignment of error is not well-taken.
In appellant's second assignment of error, he contends that the conviction is against the manifest weight of the evidence. In State v.Thompkins (1997), 78 Ohio St.3d 380, 386, the Ohio Supreme Court stated that the "legal concepts of sufficiency of the evidence and weight of the evidence are both quantitatively and qualitatively different." The court explained that while an appellate court may determine that a judgment is sustained by sufficient evidence, it may still conclude that the judgment is against the weight of the evidence. (Citation omitted.) Id. at 387.
In contrast to sufficiency, the court stated the following in regard to weight of the evidence:
 "Weight of the evidence concerns `the inclination of the greater amount of credible evidence, offered in a trial, to support one side of the issue rather than the other. It indicates clearly to the jury that the party having the burden of proof will be entitled to their verdict, if, on weighing the evidence in their minds, they shall find the greater amount of credible evidence sustains the issue which is to be established before them. Weight is not a question of mathematics, but depends on its effect in inducing belief.'" (Citation omitted.) (Emphasis in original.) Id. at 387.
The Ohio Supreme Court also noted that when an appellate court reverses a verdict as against the manifest weight of the evidence, the appellate court sits as the "thirteenth juror" and "disagrees with the factfinder's resolution of the conflicting testimony." Id. In reviewing the entire record, an appellate court:
 "`weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction.'" Id., quoting State v. Martin (1983), 20 Ohio App.3d 172, 175.
Upon review of all the evidence presented in this case, we cannot say that the jury lost its way and created a manifest miscarriage of justice. Appellant's conviction for voluntary manslaughter is not against the manifest weight of the evidence. Accordingly, appellant's second assignment of error is not well-taken.
In appellant's third and final assignment of error he argues that he was denied the effective assistance of trial counsel. Specifically, appellant argues that his trial counsel was ineffective in failing to have a DNA test conducted on the blood found on the knife.
Legal representation is constitutionally ineffective, and a basis for reversal or vacation of a conviction, when counsel's performance is deficient and results in prejudice to the accused. Strickland v.Washington (1984), 466 U.S. 668. In order to prove ineffective assistance of counsel, a defendant must show (1) that his counsel's performance fell below an objective standard of reasonable representation in some particular respect or respects and (2) that he was so prejudiced by the defect or defects that there exists a reasonable probability that, but for counsel's errors, the result of the trial would have been different.State v. Bradley (1989), 42 Ohio St.3d 136, paragraphs two and three of the syllabus, following Strickland.
In Ohio, a properly licensed attorney is presumed competent, and the burden is on the appellant to show counsel's ineffectiveness. State v.Lytle (1976), 48 Ohio St.2d 391, 397; State v. Hamblin (1988),37 Ohio St.3d 153, 155-156. Debatable trial tactics generally do not constitute ineffectiveness. State v. Phillips (1995), 74 Ohio St.3d 72,85, citing State v. Clayton (1980), 62 Ohio St.2d 45, 49.
We first note that when asked why the BCI did not conduct a DNA test on the knife, forensic scientist Saupe testified that she was not able to conduct further testing because she did not have a sufficient sample. Even assuming that the test could have been conducted, the decision not to require a DNA test falls within the realm of trial tactics. Further, there is no evidence in the record that the blood could have come from anyone other than Lofton. Finally, even if the DNA test would have revealed that the blood was not Lofton's, that does not necessitate that the outcome of the trial would have been different. There was still sufficient testimony to sustain appellant's conviction and sentence. Accordingly, appellant's trial counsel's alleged failure to obtain a DNA examination of the knife did not fall below an objective standard of reasonableness.
Accordingly, appellant's third assignment of error is not well-taken.
On consideration whereof, we find that appellant was not prejudiced or prevented from having a fair trial, and the judgment of the Lucas County Court of Common Pleas is affirmed. Appellant is assessed the court costs of this appeal.
 ______________________ James R. Sherck, JUDGE
Richard W. Knepper, J. and Mark L. Pietrykowski, P.J. CONCUR.
[1] In its February 17, 2000 judgment entry, the trial court dismissed the violent repeat offender specification.